## THE LA PLAISANCE BAY HARBOR COMPANY *v.* THE COMMON COUNCIL OF THE CITY OF MONROE *et al.*

The ordinance of 1787, for the government of the Territory of the United States northwest of the River Ohio, is no part of the fundamental law of the state, since its admission into the Union. It was then superseded by the state constitution; and such parts of it as are not to be found in the federal or state constitution, were then annulled by mutual consent.

That ordinance was enacted before the constitution of the United States, with a view to existing circumstances; and was intended to operate between the confederacy and the territory, as the articles of confederation did between the States. In construing it, the articles of confederation, and not the federal constitution, must be looked at.

Navigable waters are public highways at common law; and the only object of the clause in the ordinance of 1787, relating thereto, was, to secure to citizens of the confederated states such rights, in relation to those waters within the territory northwest of the Ohio, as were already possessed by the inhabitants of that territory; and to prevent any tax or duty on persons navigating them.

By the "permanent constitution and state government," mentioned in the ordinance, is to be understood the establishment of a new government, as a substitute for the territorial one, and a constitution instead of the ordinance; and this substitution was to be not for part, but for the whole of each.

There is nothing in the ordinance prohibiting the state from improving its navigable waters.

Where complainants were authorized by their charter to erect works, &c. and improve the harbor of La Plaisance bay, *held*, that the diversion of a river, at a point some distance above its mouth, in the bed of which they had no title, which flowed into said bay, and caused a channel to be kept open through it, created no damage for which they were entitled to compensation.

The beds of all meandered streams and navigable waters, belong to the state within which they lie; and the riparian proprietor has no right to the land covered, without express grant.

Public grants are to be construed strictly, and nothing passes under them by implication.

THIS was a motion to dissolve an injunction, for want of equity in the bill.

The bill states that the complainants, by an act of the legislature of the Territory of Michigan, approved April 25th, 1825, were constituted a body politic and corporate, for the purpose of improving the harbor of La Plaisance bay, on the border of Lake Erie, in the county of Monroe, and erecting piers, wharves, warehouses, and other necessary buildings and improvements in and about said bay, for commercial purposes, and to purchase and hold such real and personal estate as should be necessary for the purposes of their creation; and that they have gone into operation, and continued their corporate succession regularly, down to the time of filing the bill of complaint. That, soon after their organization, complainants proceeded to erect a warehouse on a pier in said bay, on the margin of the channel of a branch of the River Raisin, which runs into said bay; and, finding it necessary for the convenience of vessels loading and unloading, to connect their warehouse and wharf with the shore, and the southwest shore of the bay being the nearest available point, they created, at great expense, a bridge or wharf extending to the shore, the space between their selected location and the shore being an extent of shallow water and marsh, unfit for their purposes, and which could not be reached by vessels carrying on the commerce of Lake Erie. That their object in selecting their location was to command the nearest possible approach to the city (then village) of Monroe, and that the current of the River Raisin, running through said bay, and by their warehouses, caused a sufficient depth of water to ensure access to most of the vessels and other craft navigating the lakes; that no sufficient depth of water could be obtained, unless the current which runs by their works, (and which is caused by the

principal branch of the River Raisin running into said bay,) were kept clear and unobstructed; that, when its discharge and flow are unobstructed, this result is obtained, except at uncommonly low stages of water in Lake Erie, and a depth of water obtained in the channel averaging from six to nine or ten feet, or more. That, about the twenty-fifth day of December, 1825, they purchased a piece of land on the southwest side of the bay for the purpose of making the connection above mentioned between their warehouse and wharf, on the margin of the channel and the shore, and then accomplished the connection by building the before mentioned bridge or way, on piles extending about twelve hundred feet, at an expense of several thousands of dollars. That, for six years past, they have been in the peaceable possession and enjoyment of the property, and their works have been for a long time the principal and almost only point of communication for the lake commerce with the city of Monroe and the adjacent country, and have been a source of considerable profit to themselves. That the availability of their works, and the sufficiency of the channel aforesaid for navigation, depends upon the unobstructed flow of the waters of the river, and that the channel will hereafter, as heretofore it has done, continue to be a safe and commodious passage for steamboats and vessels to and by said wharf, unless the branches emptying into La Plaisance bay are stopped, or the water is in any way diverted; that, if such stoppage or diversion is permitted, the channel will become obstructed by alluvial deposites, which the current is now strong enough to carry away, and the works of complainants will be rendered worthless.

That the River Raisin and La Plaisance bay are connected with the St. Lawrence river, by means of Lake Erie; that they are within the country formerly called the

Northwest Territory, and subject to the ordinance of July 18th, 1787, entitled "An ordinance for the government of the Territory of the United States northwest of the River Ohio;" that, among certain articles of compact therein contained, is one declaring that "the navigable waters leading to the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other state that may be admitted into the confederacy, without any tax, impost, or duty therefor." That, by an act of congress providing for the sale of the public lands in the territory northwest of the Ohio, passed May 18th, 1798, this article was recognized and affirmed; and that, in making the United States surveys, the said river and its branches have never been included in any survey, sale, or grant, but have been left free and unincumbered. That complainants are entitled to have it remain so, and that they are citizens of the United States.

The bill further shows that by an act of the legislature of the state of Michigan, entitled "an act to amend an act entitled ' an act to incorporate the city of Monroe,' approved March 22d, 1837," approved April 6th, 1838, the common council of the said city of Monroe, were authorized and empowered to finish and complete the canal and piers already commenced by the United States government, connecting the waters of the River Raisin with Lake Erie, together with proper piers and basins for said canal within the limits of said city, and to improve the navigation of the said river within the limits of said city, by cutting through the bends of the river. The act further provided for the election of canal commissioners, &c. That the common council of Monroe, and the canal commissioners, having contracted with Harvey W. Campbell and

La Plaisance Bay Harbor Co. *v.* City of Monroe.

George W. Strong for that purpose, are proceeding under color of said act to excavate a canal from the River Raisin to Lake Erie, and are driving piles in some places in the bed of the river, causing an obstruction to the current, and by these and other things diverting and impeding the channel of the river, and causing it gradually to become filled up. That they have commenced and are proceeding with a dam in the river above complainants' works, which will entirely cut off the water flowing from the river into the bay, and destroy the usefulness of complainants' buildings and improvements. That the individuals engaged in the operations are irresponsible, and complainants, if left to their remedy against them, will be compelled by the necessity of a multiplicity of suits, &c. to lose most of their property without compensation. That the excavations, piers, canal &c. will create a public nuisance.

Prays that defendants may be restrained from proceeding further, and may be compelled to remove the obstructions and works they have already finished or commenced, and which will in any manner impede the free and unobstructed flow of the channel by complainants' works, and for such other or further relief as the Court shall see fit to grant.

The defendants moved to dissolve the injunction which had been granted on the filing of the bill.

*T. Romeyn,* in support of the motion.

I. The Court of Chancery has no jurisdiction in the premises. There is no equity in the bill.

*First.* The acts complained of, are not in contravention of the ordinance of 1787, for the government of the territory northwest of the River Ohio.

1. The ordinance was not designed to deprive the states which might be formed in the Northwest Territory of any

control over their navigable waters, which the original states could exercise over navigable waters within *their* limits.

2. Even if this were not so, yet the acts complained of are intended and adapted to *improve* the navigation of the river, and, therefore, are not within the supposed inhibitions of the ordinance. Of their expediency, the legislature, and not the Court, must judge.

*Second.* The acts complained of, are not in contravention of the article in the constitution, which inhibits the taking of private property for public use, without compensation.

II. Even if the Court has jurisdiction, the injunction · should be dissolved.

1. The damage to the complainants, is only in anticipation, and it is not certain whether it will ever be felt.

2. The acts complained of, not being of *themselves* nuisances, there should have been an issue to a jury, to ascertain whether, *in their circumstances and results*, they involved a nuisance.

3. The damage to the defendants, from the delay of their works, will be great and immediate; the damage of the complainants is remote and doubtful. Under these circumstances, a preliminary injunction should not have been granted. Having been granted, it should be dissolved.

4. The injunction should not have been granted without security for damages.

*D. Goodwin and H. T. Backus*, contra.

*H. T. Backus.*

I. Has this Court jurisdiction of the subject matter?

It is a well established branch of equity jurisdiction, to prevent the creation of a public nuisance, which also tends

La Plaisance Bay Harbor Co. *v*. City of Monroe.

to the destruction of private property; and this Court has undoubted right to interfere by injunction, where either private individuals, on their own responsibility, or persons in an official or *quasi* official position, purporting to act under a statute, are doing unwarrantable acts, to the injury and destruction of the rights of others.

II. The case made by the bill entitles the complainants to the relief sought.

1. By the organization of the La Plaisance bay harbor company, their rights under their charter have become vested, and cannot be taken away. As a corporation they possess all the powers conferred by the act, and all implied powers necessary to effect the object of their creation; and their implied rights are equally inviolable with their express powers.

2. The River Raisin, which defendants seek to dam and divert, is one of the rivers and water courses embraced in the ordinance of 1787, and their acts are in violation of the provisions of that ordinance, respecting such waters.

3. A vested and well defined interest in the use of water, whether navigable or otherwise, may exist as well as an interest in any other species of property.

4. Neither the state, nor the city of Monroe, can destroy the property of individuals, except upon the constitutional terms of giving adequate compensation.

5. The act of the legislature under which defendants are proceeding, authorizes no such acts as are complained of. No act will be construed to have an effect so manifestly subversive of private rights, unless expressed in the most unequivocal terms.

THE CHANCELLOR. The motion is opposed, principally, on two grounds:

*First.* That the act amending the charter of the city

of Monroe, so far as it relates to the improvement of the navigation of the River Raisin, in the manner stated, is in contravention of the ordinance of 1787, for the government of the territory of the United States, northwest of the River Ohio; the ordinance providing that " the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor. *Art.* 4.

*Second.* That no provision is made by the act for compensating complainants, or others, who might be injured by the improvement, in pursuance of the state constitution, which says, " The property of no person shall be taken for public use, without just compensation therefor." *Art.* 1, § 19.

It was also urged, as a reason why the injunction should not be dissolved, that the act of the legislature does not authorize a dam across the river. It is true the act says nothing about a dam, but it authorizes the defendants to finish and complete the canal and piers heretofore commenced by the United States; and it is nowhere stated in the bill, that the dam is not a part of the improvement originally contemplated. But whether that be so or not, is immaterial. The object intended, is the improvement of the navigation of the river; and, to that end, the act authorizes the turning of it, at certain points, from its natural bed into new channels, where it might be made better to subserve the ends of commerce. The erection of the dam, for this purpose, is clearly within the act. It is not necessary that the power should be expressly given; it may be implied from the nature of the grant. It would

be useless to form a new bed for the river, if the power to turn the water into it was withheld.

The injunction must, therefore, be dissolved, unless it can be sustained on one or the other of the grounds above stated.

The ordinance of 1787, in my opinion, is no part of the fundamental law of the state since its admission into the Union. It was then superseded by the state constitution, and such parts of it as are not to be found in either the federal or state constitutions, were then annulled, by mutual consent.

The articles of confederation between the thirteen original states, were entered into July 9th, 1778, and were afterwards suspended by the constitution of the United States, in March, 1789. The ordinance was passed July 13th, 1787,—one year and eight months before the constitution took effect, and two months before it came from the hands of the convention that formed it. The ordinance must, consequently, have been drawn with a view to the then existing government under the articles of confederation. If the constitution had been in operation at that time, it can hardly be supposed that the ordinance would have been what it is; for a new, and, in most respects, entirely different state of things exists under the constitution, from what existed under the articles of confederation. To understand, therefore, the ordinance, and the different objects had in view by it, we must look to the articles of confederation, and not to the constitution of the United States.

Most of the ordinance was subject to change or alteration, by congress, or the territorial legislature. Of this character is the whole ordinance, except the last two sections; one of which, (the last section,) contains six articles of compact between the original states and the people and

states in the territory, which were to remain unalterable, unless by common consent.

These articles appear to have had several objects in view. *First.* To supply the place of a constitution, until the new states to grow up in the territory should be admitted to all the rights of the confederacy. Without something of this kind, the property and personal liberty of the inhabitants of the territory would have been subject to the caprice or whim of the local legislature. *Second.* To make the territory a part of the confederacy, with certain rights, before the new states were organized; and not a mere dependency of the confederacy, without any rights of its own. The confederation was a compact between sovereign states. It was obligatory upon, and secured the rights of, the states that were parties to it, but it went no further; and, when the territory northwest of the Ohio ceased to be a component part of any one of these states, it would, at the same time, have ceased to be a part of the confederacy, and to be subject to the articles of confederation, but for the ordinance. Between the confederacy and territory, the ordinance was what the articles of confederation were between the original thirteen states,—a bond of union, and a guaranty of the rights of the citizens of each within the territorial limits of the others. Hence, by the fourth article of the ordinance, the territory and states to be formed therein were to remain a part of the confederacy, subject to the articles of confederation, and the acts and ordinances of congress,—to pay a part of the federal debt and expenses of the federal government, and for that purpose to levy taxes;—not to interfere with the primary disposal of the soil by the United States, and to impose no taxes on lands belonging to the United States.

The same article further provides that non-resident pro-

prietors shall not be taxed higher than residents; and "that the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other state that may be admitted into the confederacy, without any tax, impost, or duty therefor." All navigable rivers, by the common law, which law was guarantied to the citizens of the territory by the ordinance, are public highways. The clause in question was not necessary to secure these rights, and it would not therefore, perhaps, be a forced construction of it, to say that it was intended to secure within the territory, to the citizens of the states, what was already secured to them in the states by the fourth article of confederation, which says, "the people of each state shall have free ingress and regress to and from any other state, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions, as the inhabitants thereof, respectively." The articles of confederation dealt with states only. Besides, the drift of the whole seems to be to guard against the imposition of any *tax*, *impost*, or *duty*, on persons travelling or trading upon the rivers of the territory, which, at that early day, must have been its principal, if not only highways.

*Third.* The principal and great object of the ordinance was, to secure to the states, to be formed within the territory, admission into the Union on an equal footing with the original states, and with constitutions, and forms of government, based upon the great fundamental principles of civil and religious liberty contained in the ordinance itself; except so far as they might be departed from, or changed, with the assent of both parties. The articles of

confederation provided for the admission of no state, except Canada, without the assent of nine of the thirteen states. *Art.* II. Now, each of the states of the northwest territory was, by the ordinance, to be admitted into the Union, on an equal footing with the original states, in all respects whatever, when it should have sixty thousand free inhabitants. It was also to be at liberty "to form a permanent constitution and state government: Provided, the *constitution and government,* so to be formed, shall be republican, and *in conformity to the principles contained in these articles.*" By permanent constitution and government, I understand a new government, that is to take the place of the territorial government, and a constitution, that is to take the place of the ordinance. That the one is to be substituted for the other, not in part, but in the whole.

Such appears to have been the construction given to the ordinance, by congress, on the admission of the state. It was made one of the conditions of her admission that she should not interfere with the sale, by the United States, of the vacant and unsold lands within her limits, and that she should not tax them. *R. S.* 30. The same condition was also attached to the grant, made by congress, of public lands to the state, with a further condition, that the state should not tax the lands of non-resident proprietors higher than those of residents. *Laws* 1836, *p.* 59. The ordinance contains like limitations of the power of the local legislatures, but there was nothing of the kind in the state constitution.

The thirteenth section of the ordinance, which is in the nature of a preamble to the following section containing the articles of compact, declares the different objects had in view by them. One of those objects is stated in these words: "to fix and establish those principles as the basis of all laws, *constitutions and governments,* which forever

hereafter shall be formed in the said territory." That is, to determine the different political elements that should enter into, and form, the constitutions and governments of the states which should grow up in the territory, unless waived by common consent. Every thing, therefore, contained in the ordinance, and not carried into the state constitution, was annulled by common consent, on the admission of Michigan into the Union.

Whether correct or not, on this point, is immaterial in the present case. There is nothing in the ordinance prohibiting the state from improving the navigation of its rivers. *Spooner* v. *McConnell*, 1 *McLean R.* 337; *Hutchinson* v. *Thompson*, 9 *Ohio R.* 52. The mode of improvement is to be determined by the legislature, and not by the Court. But the state, or those authorized by it, cannot take private property for that purpose, without first making compensation. The state constitution says: "The property of no person shall be taken for public use, without just compensation therefor." *Art.* 1, § 19. This brings us to the all important question,—the rights of complainants in the water of the River Raisin.

Have the complainants a right to the flow of the water in the Raisin, in its natural bed? They do not own the bed of the stream, or the land on either side of it. Their warehouse and wharf are not on the bank of the river, but in La Plaisance bay, which forms no part of the river, but is a part of the shore of Lake Erie. The river empties into the bay, or, rather, into what may be called a neck of the bay, about a mile and a half north of the wharf. This neck extends, in a southerly direction, about half or three quarters of a mile, and the whole bay, with this exception, is a part of the lake shore. This is not a case, then, in which the defendants are about to divert a stream that has been wont to flow through complainants'

land. The complainants do not own either the bed, or the banks, of the river, below the point of obstruction. The bed of the stream is public property, and belongs to the state. This is the case with all meandered streams, no part of them being included in the original survey; and the common law doctrine of *usque ad filum aquæ* is not applicable to them. The public owns the bed of this class of rivers, and is not limited in its right to an easement, or right of way only. So, with regard to our large lakes, or such parts of them as lie within the limits of the state. The proprietor of the adjacent shore has no property whatever in the land covered by the water of the lake. The land under complainants' warehouse and wharf belongs to the state. We must look then, for complainants' rights, to their charter, and to that alone.

If their charter does not give them the right for which they contend, they have no such right; and the damage they may sustain, if any, will be *damnum absque injuria*. It will be one of those remote consequential damages, which a greater or less number of individuals sustain by every public improvement. Every diversion of trade into new channels, is an injury to those who were previously in receipt of its profits. But this is an injury for which the law makes no compensation; for, if it did, there would be an end to every thing like improvement. Should the improvement of the defendants take away all business from complainants' wharf, it would be the misfortune of the latter, but the defendants would be under no legal or moral obligation to make remuneration. So, if, in consequence of the diversion of the river, the channel in front of their wharf should be filled up by the action of the winds and waves; unless they have a right under their charter to the flow of the river in its natural channel.

The charter does not so much as mention the River Rai-

sin, or the current, or channel formed in the bay by the water discharged at its mouth; nor is there, in any part of the charter, the most distant allusion made to either. John Anderson and seven other individuals named in the act, and such other persons as had associated, or should associate with them, were incorporated "for the purpose of improving the harbor at La Plaisance bay, on the border of Lake Erie, in the county of Monroe, and erecting piers, wharves, warehouses, and other necessary buildings and improvements, in and about said bay, for commercial purposes." This is the whole extent of the grant made to complainants. The right contended for is not given in express terms, and, if it exists, must be implied. I can see nothing in the charter from which it can be implied. No one, from reading the charter, would dream of it. But it is unnecessary to pursue this branch of the case further; for all public grants are to be construed strictly, and nothing passes under them by implication. *Charles River Bridge* v. *Warren Bridge*, 11 *Pet. R.* 544. *Stourbridge Canal* v. *Wheeley*, 2 *Barn. & Adol.* 792.

Injunction dissolved with costs.